Case number 2014-17-14, David Todd et al. v. Kevin M Regan. We're going to have to exceed 15 minutes per side. Mr. Kazuchowski. Thank you. If you did reserve time, if you could let me know that, please. Your Honor, I did. I reserved four minutes. You may proceed. May it please the Court, again, Mark Kazuchowski on behalf of the appellees, or appellants, excuse me, David Todd and Robert Wojciechowski. Your Honor, the question presented today is whether under plaintiff's versions of facts, of the material facts, whether a reasonable officer could have believed that their actions were proper, that these two officers' actions were proper. We believe the answer to that question is yes. Plaintiff's response are... Mr. Kazuchowski, unfortunately, it's not quite that clear. Okay. And let me suggest to you why. We face this conundrum all the time on these qualified immunity appeals. You have to accept the plaintiff's version of the facts without question. So some lawyers do that and do that clearly. Some say they are, but really spend most of the time on their own set of facts. And then some just don't get it at all. It seems to me that throughout these pleadings, you don't come even close to accepting the plaintiff's version of these facts. So I would suggest that we start out that way because unless you can convince me otherwise, and of course I don't speak for Judge Stranch and Judge Daughtry, but we don't have jurisdiction the way you've pled this case. Okay, Your Honor. Let me try to clarify it then. Let's start with just walking through what I consider the three main focus points of this case. The first is when the officers were called out, they were called out for a complaint of drunken teenagers running the hallways of an apartment complex. When they got to the complex, they're confronted with, and this is without dispute, an individual who smelled of alcohol, who concedes that he appeared to be underage, just turning 21 a couple months earlier, and having admitted that, generally speaking, he always got carded back in 2010 because of his appearance. And where were they confronted by him? They were confronted by him at the front door of the same apartment address complex in the common area where the same complaint originated from. This is just an example. How can you say they were confronted by him, depending on what you mean by that word? They knocked on the door to try to get in because it was locked, and the dispute of facts starts right there. Your guys say that he wandered back and forth and he delayed getting him in and your people testify inconsistently. He says he let him right in. But, Your Honor, I'm not disputing that fact. In fact, take Plaintiff's version as true. He completely cooperated. He walked downstairs and opened the door. And when the officers walked in, there was no question they smelled alcohol on his breath and he appeared to be a minor. At that point, they have reasonable suspicion to investigate whether he's a minor and intoxicated, which is a crime, as well as whether he might have been the individual that the call was about. They have independent observation, not just an independent tip. They have now smelled alcohol on his breath. They now physically see this individual. So they come into the door. The next step is, now that I have reasonable suspicion, do I have a right to detain? Yes, I do. I have a right to detain to investigate. He's holding keys in his hand. Do you have a right to detain or do you have a right to investigate? I think I have a right to detain at that point because I think he could have committed a crime. A reasonable officer could believe I just confronted a minor in possession of alcohol. Did he take alcohol in his hand? I smelled it on his breath and he appeared to be a minor. That's all that the officer needs for reasonable suspicion. And at that point in time, I can investigate and detain because I do believe at that point that he may be committing a crime. When you're using the word detain at that point, I assume you mean a Terry stop. Well, they never got to the Terry stop, and that's the problem. They went to secure him because of the location. He's on top of a stairwell next to a stairwell going downstairs. That's exactly why Judge Stranz and I are asking you this question. You simply go straight to detain, but you use the standard for an investigative stop. So we're conflating two things here, and then you say, quote, that's the problem, end quote. They went straight to detaining. That's probable cause. That's a higher standard. Under Graham v. O'Connor, when you're doing a detention or whether you're doing an arrest, when you go to— When they grab him and take him down to the ground and put handcuffs on him, that's an arrest, right? Not at that point. At that point, they're using force to control him, to actually secure him. We interrupted your colloquy. So they're in the door. You say he looks young and he smells of alcohol. Yes. So the individual continues to walk towards the basement, gets onto the top landing of the stairwell. At that point, the officers are saying, stop. They go to stop him. The plaintiff doesn't say they say stop. They go to stop him. He has keys in hand. They go to reach for his keys to secure him so he doesn't leave. He pulls his hand and his arm away with his keys still in hand. At that point in time, the officers have a decision to make. What appears to be a drunken individual on top of a stairwell, if I can get him to the ground— Wait a minute. Now you've switched to now he's appeared to be a drunken individual. I didn't see one single reference in any of these briefs that he was exhibiting any characteristics of being drunk. That's a far cry from them smelling alcohol on his breath, is it not? Well, Your Honor, again, taking the plaintiff's facts as true, he's denying that he was drunk. However, I did provide the video of the booking room where he's swaying, slurring his speech, and is exhibiting. And that's—you can't deny that on the video. So that's—if you look at the factual record, he is drunk. Now we're going to do a different ballgame because you now see our problem. He doesn't admit that he's drunk. But we do have the high-speed police chase from the Supreme Court that says that you can disregard what the plaintiff says if it's incontrovertibly not true, or words to that effect, because they had a high-speed dashboard camera that showed what had really happened. So you're saying, based on the booking video, it's incontrovertible that he was drunk. He blew a .156 on the data master, and you can see him slurring his speech. And then you see him, when he's going to do his fingerprinting, wobbling. And even the officers know, hey, you're kind of turning into a wee wobble here, and they get his balance confirmed. That's actually happening after the fact. That's when he's already back at the police department. But getting back to the attempt to detain or to frisk him, I'm just struggling with that because Arizona v. Johnson, United States v. McMullen here in the Sixth Circuit are very clear that to justify a frisk, the officer would have to reasonably suspect that Reagan was armed and dangerous. How do you ever qualify for that? Well, Your Honor, again, and I think the disconnect here is the first part where I'm saying, number one, they have a right to secure them for his safety when they're even stopping him to make sure that they don't get in a pushing match on top of a stairwell. When they go to reach for him is when he is resisting. At that point in time, our officers testified in their mind that he could have come back around with a fist, with keys in his hand. Is that an armed and dangerous determination? I would argue that it is because with keys in hand and a fist, those keys can be used as a weapon if we have to go that far. Can you say that Mr. Reagan concedes those facts? Mr. Reagan has to concede. He had his keys in his hand and he pulled away with them. He doesn't have to concede. All that it takes is for someone to hold the possession and draw it back, and then that is authorization, you say, under the law to take him down. What case do you rely on to justify that? Your Honor, I guess the cases I rely upon is just a general jurisprudence that say that it's in the officer's, if an officer can reasonably believe that he is in danger. That the officer is in danger. If the officer believes that he is going to be struck, if the officer feels that that was an aggressive move, and you don't look at it from a 20-20 hindsight, you look at it from the reasonable officer on the scene. This is where the lower court, I think, erred, is that they kept saying... I don't understand how... Let me work into the question in a slightly different way. The plaintiff's version of what happened with respect to the officers grabbing his arm is that he withdrew his arm when, without any notice or request to give him the keys, they just suddenly reached for his arm. With me so far? I agree. Now, somebody immediately reaches for you, your instinctive reaction is to pull back, is it not? It can be. It could also be to attack. Oh, come on. Did he exhibit any aggressive characteristics at all? Did he make a fist? Plaintiff's testimony was... Did he make a fist? Clenched his hand and pulled it back. What do you mean he clenched his hand? He had the keys in his hand. How can you be holding keys in your hand if your hand isn't clenched around the keys? I agree. If your hand is clenched around the keys and you pull back, what are you about to do? You're either about to hold them back or you're about to come back around. That's a proposition. So you're saying if somebody has something... Here's your fundamental proposition. Because it seems to me this is the linchpin of all of this. If somebody has something in their hands and the police grab for it and they pull their hands back, that is, as you characterize it, an aggressive move that at that point allows police, not just in this instance but in any instance, to take them to the ground. I'm saying it is reasonable for a police officer to assume that it may be an aggressive move. It's reasonable. And if it's reasonable... Have you found any... Back to what Judge Schrantz was saying. Have you found any cases that extend this concept of the police reasonably fearing for their safety to somebody simply pulling back? Well, again, most of those cases go to the police officer's version. Pretty simple question. Have you found any cases that even discuss the mere fact of withdrawing your hand when somebody reaches for it to justify a takedown? No, Your Honor, I have not. All right. But none of these cases, and just so I can be clear, none of these cases look at it from Mr. Regan's point of view. I acted instinctively. That's my testimony. I acted instinctively as Regan. They don't do that. The United States Supreme Court in Graham v. Conner, excessive force case, looked to the severity of the crime. Here we have supposedly drunken teenagers running up and down the hall and making... Not very severe. I agree with you. ...and whether the suspect poses an immediate threat to the officers or their safety. That's where I think Graham applies here, Your Honor. All right. You'll have your time for rebuttal. Thank you. Thank you. Mr. Carlson. Good morning. May it please the Court. Kevin Carlson appearing on behalf of the appellee, Kevin Regan. Your Honors, this case involves what begins in some ways as a Terry stop, but as I think defense counsel conceded in his oral argument, quickly escalated beyond the scope of an ordinary Terry stop into a confrontation that involved a non-consensual custodial seizure of the plaintiff by the defendants inside the walls of his own apartment building. When this encounter begins, my client has returned home from work. He works as a line cook at a restaurant near his apartment. It's 11.30 at night, and he begins to do his laundry so his work uniform can be clean for when he has to appear for his next shift the following morning. He's wearing his socks in either sweatpants or jeans and a T-shirt. He's carrying in one hand his phone and his iPod so he can listen to music while he does his laundry. In his other hand, he's holding his keys so he can access the basement laundry room. Every outward, objective, physical indicia is that he's a gentleman in his apartment of whatever age. It turns out he is old enough to have a beer in his own apartment doing his laundry. The record is unclear and disputed on that point. It appears that at some point after the officers have grabbed him, taken him down, and I don't know if they had cuffed him by this point or not, I think he yelled out something like, you can't do this to me, I don't even live here. And now it's a toss-up factual question what that means and why he said it. And if this case goes to trial, he's going to have to answer that question on cross. Didn't you tell these officers you didn't live in the building? I did. And the follow-up question would be? Because there were no questions beforehand. Right, that's right. There were no questions. And Terry is almost 40 years old at this point. And the rule of Terry remains that when officers approach someone with reasonable suspicion, it doesn't give them the right to just yell, wrong answer, or you answered my initial question the way I didn't like, and proceed to grab them physically and take them to the ground in the form of a complete Fourth Amendment arrest. It gives them sort of a successive degree of authority to ask reasonable questions, ascertain reasonable facts, and if they believe that the suspect is armed and presently dangerous, then and only then to do a cursory pat-down on the outer part of the body for weapons. And what factually happens in this case, if the plaintiff's version of events is accepted as credible, is they skipped all those steps. All of these cases involve a sequential analysis. And am I right that the key in the sequence here is they're concluding that because when they grab for his hand that he withdraws it, that that justifies them taking more aggressive action? Right. And our position on jurisdiction and on the merits, Your Honor, is very similar. The question of what happens precedes the legal question. The factual question of what happened and why precedes the question of was that legal. And in our client's version of events, which is corroborated in part by some of the officer's testimony and some of the police report, he opens the door cooperatively. The officer's police report concedes as much. They step into the vestibule. They ask him the preliminary question, hey, what are you doing? He says, I'm doing my laundry. They tell him wrong answer. They move to grab presumably the hand that has the keys. And as they say that, aggressively he moves back. Now there is the suggestion that at that point he's also walking away or moving away, so they're grabbing him essentially to keep him there to talk to him. Is that accepted or disputed? Disputed. Disputed, as is the question of whether he was behaving unusually, whether he was walking around and pacing in the moments before they knocked on the window. So in one of the officer's versions of events, and those versions have kind of changed over time, and we have five versions, two officer's police reports, one officer's testimony in the underlying criminal trial, that's three, both officer's testimony and deposition and discovery for this case. And there's been some, and I understand that over time, you know, this happens in every case. Their versions differ. Well, normally somebody doesn't have to stand and talk to the police if they don't want to. They can walk away. But that depends on the reason why the police are stopping them for investigative purposes to start with. Correct. So does he concede that they could smell alcohol? I think what he says is, in response to the hypothetical question, if the officers were to say that they could smell alcohol, you don't have any reason to disagree with that, correct? After all, you were drinking. And I assume he said yes because he had been drinking. Does that mean you do or you don't concede that? I concede the point that he, I don't think I have any way to disprove that my client might have smelled of beer. I'm not sure if that's a full concession, and I'm not trying to be evasive. Well, a lot of times the person that's accusing the police of excessive force or misbehavior don't have the ability to contest the police version of certain things. And this may be one of those instances, at least insofar as whether he smelled of alcohol. So let's assume, because you can't dispute it, that they came in, they start to talk to him, he smells of alcohol. Now, had he at that point refused their order to stay put, they could have taken more action, right? If there had been an outright refusal on his part? Yes, I'm asking you to assume, had they told him, we want to talk to you for a minute, and he just walked away. That would be a different set of facts, but it might entitle them to do something. May have, yes. But here you say he was compliant up to that point. They hadn't told him to do anything that he hadn't refused to do. That's correct. So his contention is at that point, without any advance notice, they grabbed for his hand. Correct. Now, there seems to be some metaphysical question here about whether the hand was clenched. Seems like we're slicing things a little thinly here, but were his hands clenched around his keys? I don't recall precisely what he testified to in either his trial testimony or his deposition. I can imagine he could have had his finger through the loop of the key. He could have been holding on to the top of a key, or he could have balled his fist around it. I honestly don't recall. So we don't know? Don't know. I don't know now. I mean, it may be answered in the record. It may be the case that at the trial or in his deposition, he testified clearly that he had it. So let's assume he had the keys in his hand, and let's assume the police could fairly characterize that as having his hand clenched around the keys. Have you found any cases that would suggest that when somebody then reaches towards that clenched hand and it's withdrawn, that justifies taking somebody down? No. Have you found any cases of almost passive resistance or inaction by the victim that even comes close to this? The two cases we cite in our appellate brief are Florida v. J.L., and there's also a case that we cite as being analogous from the Sixth Circuit. It's a criminal case where a motion to suppress was granted and, excuse me while I just find the citation, Beauchamp, B-E-A-U-C-H-A-M-P. And in that case, I don't know if the particular facts, oh, the officer saw Beauchamp walk away from what they suspected was a crime scene. They followed him, ordered him to stop, told him to walk around the fence toward them, and he complied. Then they did a frisk for weapons, asked if he could search him more thoroughly, and Beauchamp consented. And the court found that there was a Fourth Amendment violation because they didn't have the reasonable, reliable indicia of any danger presented by Beauchamp after he had complied with the officer's initial order to speak with them, and they had done their initial outside cursory pat-down for weapons. In this case, though, there's a couple things that these officers definitely did not do. They didn't identify themselves as being there on a complaint for a noise violation. They didn't say when they smelled alcohol, the logical question would be, hey, man, you got any ID on you? Do you live here? Could you just stand over there? Sorry? How old are you? How old are you? You live here alone? Anyone else with you? Have you been walking up and down the halls tonight? Could you stand over there in the corner while we ask you some questions, please? Why aren't your shoes on? You know, they say, hey, what's going on? He says, I'm going down to do my laundry. Wrong answer. Take down. I mean, it's a unique set of facts in that way, and there are some disputes. I mean, obviously the officers have their own version, and the plaintiff has his, and we'll challenge the credibility of that at trial. But the real issue here is the fact that he was there. In other words, not just smell alcohol, but was exhibiting visible characteristics of being drunk based upon the booking video. The only thing that really, well, first of all, that is most definitely an effort by the defense to inject a circumstantial fact after the fact of the arrest to argue for an inference that if he blew a .1 whatever later at the station, then he must have been drunk and belligerent and abusive and uncooperative at the scene. And he says— Let me stop you right there for a second. At any point when the officers were called upon to explain what they did, either in the report or later in their testimony, did they ever say, as their counsel is saying now, that he appeared drunk and that that was the reason why they grabbed for his keys? Glassy eyes is the term that I recall from the police report. And I would have to look at it again to conclusively state whether they also set forth additional facts suggesting that he appeared drunk. I think there may have been something about smell of alcohol and glassy eyes. I just think about it offhand now. I read the record yesterday. That's what I think is there. So, yeah, there's some mention of that. But the real question here is whether or not the district court's order, we can argue all day about what really happened at this scene, and that ultimately is the question in the case because what happens precedes the question of whether it was illegal or not, is whether the district court's order is appealable in the first place. This case involves the application of a federal statute, 28 U.S.C. 1291, which confers appellate jurisdiction to hear appeals only from final decisions of district courts. The Supreme Court has spoken very clearly in Johnson v. Jones, a case from 1995, that there is, in essence, a categorical bar on the appealability of district court orders denying summary judgment, even in qualified immunity cases, where the question of whether or not there was an illegality really hinges on the question of what happened. And credibility determinations as to what happened, when they happened, what did we perceive or not perceive, did we have a reason to perceive that or not perceive it, are not what the Supreme Court would characterize as a pure abstract question of law that would confer jurisdiction over this appeal by this court. And so, ultimately, what transpired in the 15 to 20 seconds, or 30 seconds in that vestibule, after these officers have been called to an apartment on a noise complaint, they arrest a different individual in the parking lot, they search him on the hood of their car, they let him go, and then they approach this apartment building where my client doesn't know that any of this has been happening, outside of his front door. They rap on the door, he lets them in, and then what transpires is subject to dispute. And so these are interesting legal questions, ultimately, about what the scope of Terry would be, but the scope of what Terry would be, what it would allow, what it would authorize, what degree of force would be justified at which point in the sequence, would all be determined by who you believe as to what happened and when. And for that reason, we submit that the court lacks jurisdiction and that the matter should be remanded to the trial court for a trial. Thank you. Thank you. Judge Dautry, did you have any questions of Mr. Carlson? No, thank you. All right, rebuttal. Thank you, Your Honor. I have to clarify a couple of points. In the oral argument in the lower court, Mr. Carlson argued when asked what your client's best case scenario is, best scenario facts, he said, by the officer's version of events and my client's version of events, he cooperated by opening the door and he turned to continue to go down the landing toward the laundry area of the apartment building. He did try to leave. Well, let's assume that he tried to leave. Did they tell him or ask him to stop? At that time, they went to stop him, to grab him by his arm. Well, wait a minute. At one point you said that they attempted to grab his arm because he had his fist balled and they were afraid he was going to hit him. Now you're saying that they grabbed his arm because that was how they were attempting to detain him so he didn't walk away. Your Honor, I'm not being inconsistent. What I'm telling you is they did both. They went to grab his arm, which had the keys in it, both for a safety reason and to stop him. They're trying to stop him from leaving. He can't go down the stairs. If he leaves and goes down the stairs, we don't know what's down there. You have to stop him to detain him. So they did. Now, the tactical decision to grab him as opposed to tell him to stop, again, is a tactical discretionary action by a police officer. You can grab somebody to stop him. You can ask them to stop. You can do one or both. I wanted to talk about a couple of other issues too. But your fundamental proposition is, assuming you're right up to that point, that if you grab for somebody and they withdraw, they move, then you can take them to the ground. You asked me the question if I found any cases about somebody moving their arm. That is your position, right? Yes, it is. And you asked me if I found any cases about somebody moving their arm, whether or not that implies you can do something more. In the Burchette case, in that case, the Sixth Circuit concluded officers did not use excessive force when they tackled the plaintiff, wrestled his arms behind his back and handcuffed him because the plaintiff had admitted he had twisted and turned some. Just twisted and turned. But that's not the question. The question is preliminary to that. The question of excessive force relates to what was going on. And Graham teaches that you have to look at the full circumstances. Well, the full circumstances here is you've not got a felon running away from you. You've got a guy who's heading down the steps to the laundry. You don't see any other kids. The only complaint was a noise complaint. You don't have robbery. You don't have a fleeing felon. All you've got is somebody's complaining about kids hollering in the hallway. Your Honor, respectfully, I agree with you that that is the nature of the crime. But the nature of the safety is also. Will you also agree with me that the law tells you you must consider the nature of the crime in determining the propriety of the action? It is one of the factors, but it is not a sole factor. You also have to look at the safety of the officer standing on a stairwell with someone who might be a drunk individual and whether you want to get in a pushing match with them or end it safely with no injury whatsoever to plaintiff. The plaintiff was not injured one iota, not a bump, not a bruise, not a scratch. And that's not under Morrison v. Board of Trustees, 6th Circuit, 2009. Our law is clear that this circuit does not require that there be evidence of severe injury or physical contact. Is that the law in the 6th Circuit? I was relying on the Humana case that said if you're going to handcuff somebody, they have to show some injury with respect to the handcuffing. There was no injury. Well, the circuit does not say that an injury is not required. Isn't that so? That is true, Your Honor. Doesn't that resolve the issue? It does not because you still have to look at the safety of the officers and their discretionary call to take them down in a manner which ended the threat to everybody safely without injury. And I think that is a very reasonable way to proceed by two officers dealing with somebody who might be a drunk individual who they reasonably suspect is drunk. All right, thank you. Judge Dottry, any questions? No, thank you. Thank you, Your Honor. All right, thank you. The case will be submitted. Please call the next case.